IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 19, 2002

## STATE OF TENNESSEE v. DAVID ALLEN LACKEY

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-B-1103     Seth Norman, Judge**

**No. M2001-01043-CCA-R3-CD - Filed September 6, 2002**

A Davidson County jury convicted the Defendant of one count of premeditated murder, one count of felony murder during the perpetration of a theft, and one count of misdemeanor theft. The trial court merged the two murder convictions and sentenced the Defendant to life imprisonment in the Tennessee Department of Correction for the murder conviction. The trial court sentenced the Defendant to eleven months and twenty-nine days for the theft conviction and ordered that the sentence run concurrent with the murder sentence. The Defendant now appeals, challenging the sufficiency of the evidence supporting the murder convictions and arguing that the trial court erred in failing to suppress his confession. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID G. HAYES and ALAN E. GLENN, JJ., joined.

Larry B. Hoover, Nashville, Tennessee (on appeal and at trial); and John T. Conners, III, Franklin, Tennessee (at trial), for the Appellant, David Allen Lackey.

Paul G. Summers, Attorney General and Reporter; Jennifer L. Bledsoe, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; Pamela Anderson, Assistant District Attorney General; and Lisa Naylor, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

I. PROCEDURAL HISTORY

The Davidson County Grand Jury returned indictments against the Defendant, David Allen Lackey, and his co-defendant, Billy F. Johnson, charging them with (1) felony murder during the perpetration of a theft; (2) especially aggravated burglary; and (3) theft of property valued $1,000 but less than $10,000. The Defendant's case was severed from the case against his co-defendant. The Defendant filed a motion to suppress his statement to police detectives. After a hearing, the trial court filed a written opinion denying the motion. The Davidson County Grand Jury then returned

a superceding indictment charging the Defendant and his co-defendant with (1) premeditated murder; (2) felony murder during the perpetration of a theft; and (3) theft of property valued over $500.

A Davidson County jury returned guilty verdicts on all counts, although the Defendant was convicted for misdemeanor theft, rather than felony theft, because the evidence was insufficient to prove the value of the stolen property was over $500. The trial court merged the premeditated murder and felony murder convictions and sentenced the Defendant to life imprisonment in the Tennessee Department of Correction. The trial court sentenced the Defendant to eleven months and twenty-nine days for the theft conviction and ordered that it be served concurrent with the murder sentence.

On appeal, the Defendant presents two issues for our review: (1) whether the evidence was sufficient to support his murder convictions; and (2) whether the trial court erred in failing to suppress the Defendant's statements to the police. We affirm the judgments of the trial court.

## II. FACTS

The following proof was presented at the Defendant's trial. Officer Gary T. Felts of the Metro Police Department, Traffic Division, testified that on Thursday, January 22, 1998, he was called to an accident scene at West End Avenue and Eighteenth Avenue North. When Felts arrived at 7:25 a.m., he found a 1985 Mercury Marquis that had struck a utility pole and that had a lot of front-end damage. Felts testified that no one was around the vehicle, and it appeared to be a hit and run accident. Felts also determined that the car was definitely disabled because of the amount of front-end damage. Felts testified that the windshield had damage and that it appeared that the driver had struck it when the car hit the pole. Felts testified that the trunk of the vehicle was not closed and secure, and he was able to see that the car was loaded with "different types of contents." Felts testified that he then called for assistance from a burglary detective.

Detective Larry Carter of the Metropolitan Police Department, Burglary Division, testified that on January 22, 1998, he was dispatched to work the accident scene at Eighteenth Avenue North and West End. When he arrived at the scene at about 8:00 a.m., the car had not been moved. Carter observed that the vehicle was full of TVs, VCRs, and liquor. All of the items appeared to have been "just tossed in."

Detective Carter testified that the vehicle was processed at an indoor facility where the items were first photographed in the car and then removed and photographed out of the car. The items were also identified and dusted for fingerprints. Carter testified that he tried to locate the owner using the vehicle's registration and by calling a number that was found inside the glove box. Carter stated the car was registered to Billy Wiggins, the victim in this case. Carter went to the address on the registration, 716 Graymont Drive, but no one answered the door. Carter and a patrol officer talked to the neighbors and called ADT Security in an unsuccessful attempt to locate the owner of the car. Carter also returned the next day, but stopped attempting to find Mr. Wiggins when he was called off the investigation to go to another call.

Officer Raymond T. Rader of the Metro Police Department, Identification Section, testified that he processed the contents of the car. Rader testified he was able to develop useable latent prints from a telephone book, a VCR, a wall clock, and a bottle of San Juan Rum.

Lieutenant Jim Stephens stated that on January 24, 1998, he responded to a call from another officer that a body had been found at 716 Graymont Drive, a residential area of south Nashville near Briley Parkway. Stephens testified that when he arrived at the scene at about 6:10 p.m., he immediately noticed a strong smell of decomposition and observed a body, mostly covered, lying on the bed. Stephens testified that he saw a wooden handle protruding from the covers around the area of the head. Stephens also testified that he was able to determine the body's position because a hand was sticking out from under the covers, and it was slightly discolored. The body was later determined to be that of Billy Wiggins, the victim in this case.

Detective Marsha Brown of the Metro Nashville Police Department, Identification Crime Scene Investigation Unit, testified that she participated in investigating the crime scene at 716 Graymont Drive. Brown stated that she assisted Officer Tommy Elder in obtaining the measurements used to draw diagrams of the house. Brown described the general layout of the home as a one-level home with three bedrooms, a kitchen, a bathroom, a garage and a storage room. Brown testified that the deceased was found in the bedroom next to the kitchen. Brown also testified that she processed items found in the bedroom and in the bathroom for fingerprints. Brown stated that she had been able to lift prints from the bedroom door facing, from the entertainment center, and from some of the items in the bathroom.

Officer Edward Michael Shea of the Metropolitan Police Department, Crime Scene Investigation Unit, testified that he photographed the residence and processed several areas at the crime scene for latent prints. Shea stated that he lifted a print from a can of caramel corn in the living room. Shea testified that he was present when the bed linens were removed, and he saw the body of the victim. Shea observed a wooden handle of a sledgehammer that he concluded was the murder weapon. Shea noted that the victim had severe blunt force trauma in the head area.

Officer William Kirby of the Metropolitan Police Department, I.D. Technical Services Division, testified he collected and photographed a large kitchen or butcher knife found at 716 Graymont Drive. Kirby estimated the length of the blade of the knife to be ten inches and the length of the wooden handle to be four inches.

Lorita Marsh, a Police Identification Analyst with the Metropolitan Police Department, testified that she examined the fingerprints obtained from various objects at the Graymont Drive location and from the contents of the victim's car. Marsh testified she was able to identify the prints lifted from the entertainment center and from inside the bathroom as belonging to Billy (B.J.) Johnson. The prints lifted from the outside of the victim's bedroom door, the can of caramel corn, and the bottle of San Juan Rum belonged to the Defendant.

Dr. John E. Gerber, M.D., a Forensic Pathologist, testified that he performed the autopsy on the victim. Gerber stated that it was immediately apparent that the body had undergone a significant amount of putrefaction, or decomposition, due to bacteria. Gerber also noted lacerations and abrasions on the right side of the victim's head and face. Gerber testified that beneath the surface injuries, the skull was fractured, and the brain tissue was lacerated by the broken pieces of the skull, causing hemorrhaging inside the skull. Gerber determined that the cause of death was multiple blunt force injuries to the head and that the manner of death was homicide. Gerber stated that injuries such as these would certainly be fatal without medical treatment, but that death would not necessarily be instant; he reported that a person could linger and live up to an hour after sustaining such injuries. Gerber also noted injuries to the right forearm and right elbow which he described as contusions consistent with "defensive wounds."

Detective Roy Dunaway of the Metro Police Murder Squad testified that he arrived at the crime scene at 8:30 p.m. after the first responding detectives determined that the investigation in this case might be lengthy. Dunaway stated that Tom Hailey, a friend of the victim who had a key to the victim's home, discovered the victim's body. Dunaway testified that he observed the body in the master bedroom and noted that the victim's "head was completely smashed on the right side. His body was in an advanced state of decomposition, very advanced. And the sledgehammer was kind of laying beside his head with the handle . . . across his face." Dunaway testified that he found a butcher knife folded up in a blanket laying on a sofa in the living room. Dunaway testified that he spent most of the night collecting evidence in the home. He stated that there were packed boxes in various rooms throughout the home and that items had been removed from the attic. The boxes, along with an apartment application and a check written to Sycamore Apartments, indicated that the victim was preparing to move. Dunaway testified that he also found several pieces of paper with the Defendant's name on them as well as the name of another man, John Clegg, who was later eliminated as a suspect. Dunaway gave the two names to the fingerprint personnel and asked that they be compared to any prints lifted.

Detective Dunaway learned from the Defendant's father that the Defendant had checked himself into the Anchor Home on January 22, 1998. Dunaway testified that he went to the Anchor Home and informed the Defendant of the victim's death in the "gentle" manner that he would use to inform a family member or friend of a murder. Dunaway testified that the Defendant "grabbed his face, went up against the wall and slowly slid down the wall, and said three times, 'Who shot him? Who shot him? Who shot him?'" However, Dunaway stated that he "never mentioned a gun, the manner of death, when he was found, anything." Dunaway testified that the Defendant subsequently told him that he was a friend of the victim, that he stayed at the victim's home from time to time, that he did some part-time work for him cleaning buses owned by the victim, and that he knew of other people who were friends of the victim. Dunaway testified that the Defendant then agreed to accompany him to his office to assist in the investigation.

Detective Dunaway stated that the Defendant's story kept changing over the next couple of hours as they talked at the police station. Regarding the conversation, Dunaway testified as follows: Initially, the Defendant said he was nowhere around the scene of the murder at the time of the

murder and that he had not seen the victim for a couple of weeks. The Defendant then stated that he was present in the victim's house the night of the murder, but he left around 10:00 or 11:00 p.m. The Defendant stated that Billy Johnson was also present that evening. The Defendant claimed to have taken a bus when he left, but after Dunaway told him buses do not run that late at the victim's house, the Defendant stated that he must have left earlier. Next, the Defendant claimed that he slept in a downtown parking garage on Second Avenue on the night of the murder and that Johnson had "bumped into him" there about daylight on the next day. According to the Defendant, Johnson told the Defendant that he had killed the victim the night before. The Defendant again changed his story when he was told that there was no way Johnson could have gotten from where the victim's car was found to Second Avenue in the time frame of the Defendant's story. Dunaway recalled that, eventually, the Defendant stated, "Okay. I was there." Dunaway testified that he immediately advised the Defendant of his rights. The Defendant signed a waiver at 5:25 p.m. on January 30, 1998. Detective Clint Vogel was also present during the interview. The Defendant then gave his statement. Dunaway testified that a few days later, on February 2, 1998, he and Detective Vogel went to the jail to ask the Defendant about the victim's wallet, which they had been unable to find at the victim's home. The Defendant told the detectives that he could show them where the wallet had been discarded. The detectives signed the Defendant out of the jail, and the Defendant led the detectives to an area of Interstate 24 near Briley Parkway where the victim's wallet and some other personal belongings were recovered.

In his audio-taped statement, the Defendant told the detectives that he and Johnson spent the night at the victim's home on January 20, 1998 without incident. They came and went from the victim's home a couple of times the next day, finally returning to the victim's house about 10:00 p.m., where they watched television for a while. The Defendant stated that when they arrived, the victim came "buck naked" to the garage door to let them in and then went back into his bedroom where he lay in bed, either asleep or resting, with the television on.

At some point, the Defendant and Johnson were in one of the bedrooms in the rear of the house when Johnson showed a butcher knife to the Defendant and said he intended to kill the victim "because he was tired of [the victim] . . . trying to play with his genitals. You know, while he was asleep and stuff, and waking him up that way and stuff." The Defendant stated that he thought Johnson was only joking because Johnson had said similar things in the past. However, the Defendant also stated that when Johnson left the room a little while later, the Defendant tried to hide the knife from Johnson by putting it under his own pillow.

The Defendant stated that Johnson decided that he did not want to kill the victim with the knife "because it would take too long." The Defendant recalled that Johnson asked him if the victim had a sledgehammer, and when the Defendant replied that he did, Johnson told him to get it. The Defendant stated that he walked through the house to the garage and brought the sledgehammer back to Johnson, who took the hammer and began boasting that "he was a real n----r and could do this kind of stuff and show no remorse." The Defendant reported that Johnson then asked for the Defendant's gloves so that he would not leave fingerprints on the hammer. The Defendant went to

another room and retrieved the gloves while Johnson wiped down the handle of the sledgehammer with a towel.

The Defendant then stated that Johnson announced that he was going to kill the victim, after which Johnson left the room and the Defendant followed. The Defendant stated that they went to the living room, and Johnson went into the victim's room while the Defendant stayed in the living room. The Defendant said that by looking at a mirrored wall in the dining room, he could see into the victim's bedroom. The Defendant stated he saw Johnson swing the hammer three times. The Defendant stated that the first time he heard a cracking sound and the victim moan. The second time, he heard the same sounds, but on the third blow there were no sounds. The Defendant said that Johnson ran out of the room and said, "Oh my God I just killed him, I just killed him," and then, "See, that's what real n---rs do. Go out and kill people and not give a shit."

The Defendant stated that Johnson came out of the bedroom and started turning lights on all over the house, but the Defendant kept turning them off because he wanted to turn on the TV in the living room. According to the Defendant, approximately ten to fifteen minutes later, Johnson decided that they should get drunk. The Defendant and Johnson obtained some beer and liquor from the victim's room. The Defendant stated that Johnson covered the victim with a blanket so that the Defendant would not have to look at him. The Defendant recalled that they drank for a while in the living room. The Defendant said that Johnson wanted to "go through [the victim's] shit." The Defendant recalled that he went through the victim's pants pocket and found the victim's wallet and $1.90.

The Defendant stated that after some time had passed, he and Johnson went into a back bedroom because Johnson wanted to watch cartoons, and the living room TV was not working. The Defendant stated that Johnson made several more trips to the victim's room to get beer, bringing back only one or two beers at a time. The Defendant said that the victim continued to make gurgling sounds during this and for about forty-five minutes. The Defendant maintained that he did not call an ambulance or suggest calling an ambulance because he was scared Johnson might "try to do something to [him]."

The Defendant stated that once they were in the back bedroom, Johnson kept trying to get him to drink more, but the Defendant told Johnson that he did not want to drink more. The Defendant also stated that he tried to call his girlfriend, but she did not answer. The Defendant then called to get the time, which was 1:48 a.m.

The Defendant stated that at approximately 2:45 a.m., he and Johnson left the victim's house and drove around for a while. The Defendant reported that Johnson drove the victim's Mercury and that they returned to the victim's house at about 3:30 a.m. The Defendant recalled that around 4:16 a.m., he and Johnson ran out of cigarettes so they took the victim's car and drove to a nearby gas station. The Defendant stated he went in alone to buy the cigarettes while Johnson waited in the car. The Defendant said that he and Johnson went to look for prostitutes, but they were not successful in hiring one and, again, returned to the victim's house.

Once back at the house, the Defendant and Johnson began drinking again. At about 6:00 a.m. they began to pack up the victim's car with TVs, VCRs, and other items from the victim's home. The Defendant stated that because the trunk would not shut, he had to tie it closed with wire. They pulled out of the driveway at about 6:15 a.m. with Johnson driving. The Defendant stated that he told Johnson that he wanted to be dropped off downtown, but Johnson refused to drop him off because he needed the Defendant's identification to be able to pawn the stolen items. The Defendant said that he agreed to go with Johnson to the pawn shops, because he did not know if Johnson had the butcher knife with him, and he was afraid.

The Defendant stated that while they were on their way to a pawn shop on Charlotte Avenue, Johnson lost control of the car while trying to turn and struck a light pole on West End Avenue. The Defendant said that he and Johnson then fled the scene on foot. The Defendant stated that as they walked, Johnson kept complaining about being hungry and wanting to find a place to sleep. They walked to Seventh Avenue and Union Avenue, where the Defendant bought some french fries for Johnson, and then they walked to Second Avenue and Commerce Street. There, the Defendant showed Johnson a parking garage where he could sleep on the top floor because people do not usually go all the way to the top. The Defendant stated that Johnson talked about doing a carjacking, but the Defendant told Johnson that he did not want to participate. The Defendant told Johnson he was going to go get his check, get it cashed, and come back so they could get something to eat. The Defendant stated that, instead, he went directly to Anchor Home and checked himself in.

## III. ANALYSIS

### A. Sufficiency of the Evidence

The Defendant contends that insufficient evidence was presented at trial to support his convictions. When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 324 (1979); State v. Duncan, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).

In determining the sufficiency of the evidence, this Court should not re-weigh or re-evaluate the evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. State v. Buggs, 995 S.W.2d 102, 105 (Tenn. 1999); Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). Questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact. Liakas, 286 S.W.2d at 859. This Court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record, as well as all reasonable inferences which may be drawn from the evidence. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Because a verdict of guilt against a defendant

removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. Id.

### 1. Premeditation

The Defendant was convicted of premeditated murder for the death of victim Bill Wiggins. First degree premeditated murder is the premeditated and intentional killing of another person. Tenn. Code Ann. § 39-13-202(a)(1). Once a homicide has been established, it is presumed to be second degree murder, and the State has the burden of proving premeditation to raise the offense to first degree murder. State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999) (citing State v. Nesbit, 978 S.W.2d 872, 898 (Tenn. 1998)). Premeditation is defined as "an act done after the exercise of reflection and judgment." Tenn. Code Ann. § 39-13-202(d).

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. Premeditation is the process of thinking about a proposed killing before engaging in the homicidal conduct. State v. Brown, 836 S.W.2d 530, 540-41 (Tenn. 1992).

The existence of premeditation is a question of fact for the jury to determine and may be inferred from the circumstances surrounding the offense. State v. Rosa, 996 S.W.2d 833, 837 (Tenn. Crim. App. 1999) (citing Brown, 836 S.W.2d at 539). "[T]he use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and calmness immediately after the killing" may support the existence of premeditation. See State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). This Court has also ruled that the jury may infer premeditation from planning activity by the defendant before the killing, evidence concerning the defendant's motive, and the nature of the killing. State v. Bordis, 905 S.W.2d 214, 222 (Tenn. Crim. App. 1995).

Viewing the evidence in the light most favorable to the State, a jury could have reasonably found the Defendant guilty of premeditated murder. There is no dispute that the Defendant did not, himself, inflict the fatal injuries that killed the victim. However, "[a] person is criminally responsible for an offense committed by the conduct of another if: . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense." Tenn. Code Ann. § 39-11-402. Additionally, "[p]resence and companionship with the perpetrator of a felony before and after the commission of the offense are circumstances from which one's participation in the crime may be inferred." State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998).

The State presented the following evidence at trial: In his audio-taped statement, the Defendant told the detectives that he and Johnson had spent the night at the victim's home on January 20, 1998. In the statement, the Defendant reported that Johnson showed a butcher knife to him and stated that he intended to kill the victim because he was tired of the victim trying to play with his genitals while he was asleep. Officer William Kirby testified that he collected and photographed a large kitchen or butcher knife found at the scene. The Defendant stated that Johnson had decided he did not want to kill the victim with the knife "because it would take too long." The Defendant stated that Johnson asked if the victim had a sledgehammer, and when the Defendant replied that he did, Johnson told him to go get it, and the Defendant did so. According to the Defendant, Johnson then took the hammer and began boasting that "he was a real n----r and could do this kind of stuff and show no remorse." The Defendant recalled that Johnson then asked for the Defendant's gloves so he would not leave fingerprints on the hammer. The Defendant went to another room and got the gloves while Johnson wiped down the handle of the sledgehammer with a towel.

The Defendant stated that Johnson announced he was going to kill the victim. The Defendant then watched through a mirror on the wall as Johnson swung the hammer three times, striking the victim and killing him. The Defendant testified that Johnson next ran out of the victim's bedroom and said "Oh my God I just killed him, I just killed him," and then, "See, that's what real n---rs do. Go out and kill people and not give a shit." Shortly after the murder, both Johnson and the Defendant took liquor and beer from the victim's room. Over the next several hours, the two watched TV, made phone calls, went joy-riding in the victim's car, went out to buy cigarettes, and tried to hire prostitutes.

Lorita Marsh testified she was able to identify fingerprints lifted from the entertainment center and from inside the bathroom as belonging to Billy (B.J.) Johnson. The prints lifted from the outside of the victim's bedroom door, the can of caramel corn found in the living room, and the bottle of San Juan Rum belonged to the Defendant.

Sufficient evidence was presented to support the jury's finding that the murder was premeditated. Johnson talked about committing the murder at length with the Defendant, chose a sledgehammer over a knife as a weapon, and guarded against leaving fingerprints before committing the crime. The evidence also supports the jury's finding the Defendant responsible for the crime. The Defendant was present and was a companion to the perpetrator of the murder before, during, and after the commission of the offense. The State presented sufficient evidence from which the jury could infer that the Defendant promoted or assisted the commission of the offense and benefited in the proceeds or results of the murder.

The Defendant points out that in his confession to the police, he stated that he thought Johnson was only joking when he announced he was going to kill the victim, and the Defendant argues that everything he did later, after Johnson committed the murder, was done because he was afraid of what Johnson might do to him if he did not comply. The Defendant argues that these two

parts of his statement could have negated a finding of premeditated murder if they had been accepted by the jury.

The Defendant further argues that the jury was not free to disregard or disbelieve his exculpatory statements while believing his inculpatory statements. However, it is the Defendant's own statement which is internally contradictory, and as such, justified the apparent decision of the jury to disbelieve the exculpatory part while believing the inculpatory part. The Defendant claimed that he did not know that Johnson was actually going to kill the victim and that he thought Johnson was just joking. However, the Defendant also stated that when Johnson left the room a little while after showing him the knife and expressing his intentions to kill the victim, the Defendant tried to hide the knife from Johnson by putting it under his own pillow. The Defendant also maintained that he was afraid of Johnson; yet he never claimed in his statement that Johnson made any specific threats against him. Moreover, when they went to get cigarettes, the Defendant went in alone. Once away from Johnson, the Defendant could have asked for help if he was really afraid of Johnson. Given the inconsistencies in the Defendant's statement, the jury was well within its rights to have discounted the Defendant's statements that he thought that Johnson was only joking and that after the murder, he acted out of fear of Johnson. Thus, the jury's determination that the State proved the element of premeditation beyond a reasonable doubt is supported by the evidence. We may not disturb this finding by the jury on appeal.

### 2. Felony Murder

The Defendant was convicted of felony murder in the death of victim Bill Wiggins. Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy . . . ." Tenn. Code Ann. § 39-13-202(a)(2). The issue concerning the felony murder in this case concerns the interpretation of the statutory phrase "in the perpetration of." For a killing to occur "in the perpetration of" a felony so that the felony murder rule applies, the killing must be "done in pursuance of the unlawful act, and not collateral to it." Farmer v. State, 296 S.W.2d 879, 883 (Tenn. 1956). "In other words, '[t]he killing must have had an intimate relation and close connection with the felony . . . and not be separate, distinct, and independent from it.'" Id. (quoting Wharton on Homicide, § 126 (3rd ed.)).

When determining whether a killing is "in the perpetration of" a felony, courts in Tennessee have considered such factors as time, place, and causation. Buggs, 995 S.W.2d at 106. A killing "may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." Id. However, "in order for the felony-murder doctrine to be invoked, the actor must intend to commit the underlying felony at the time the killing occurs; there is no felony-murder where the felony occurs as an afterthought following the killing." Id. at 107.

"[I]n a felony murder case, intent to commit the underlying felony must exist prior to or concurrent with the commission of the act causing the death of the victim." Id. "Proof that such

intent to commit the underlying felony existed before, or concurrent with, the act of killing is a question of fact to be decided by the jury after consideration of all the facts and circumstances." Id. (citing Hall v. State, 490 S.W.2d 495, 496 (Tenn.1973); State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)). "[A] jury may reasonably infer from a defendant's actions immediately after a killing that the defendant had the intent to commit the felony prior to, or concurrent with, the killing." Buggs, 995 S.W.2d at 108.

The State presented the following evidence at trial: Detective Larry Carter testified that on January 22, 1998, he was dispatched to an accident scene at Eighteenth Avenue North and West End. At the scene, he observed a 1985 Mercury Marquis, which was registered to the victim. The vehicle was full of TVs, VCRs, and liquor. All of the items appeared to have been "just tossed in." Officer Raymond T. Rader testified that he was able to develop useable latent prints from a number of items in the car, including a bottle of San Juan Rum. Lorita Marsh testified the fingerprint lifted from the bottle of San Juan Rum matched the Defendant.

In his statement to police, the Defendant admitted that after the murder, he and Johnson went through the victim's belongings, and he admitted that he took the victim's wallet and $1.90. The Defendant also admitted that he and Johnson packed up the victim's car with TVs, VCRs, and other items from the victim's home. The Defendant said that because the trunk would not shut, he had to tie it closed with wire. The Defendant stated that Johnson said he needed the Defendant's I.D. to be able to pawn the stolen items. The Defendant stated that he agreed to go with Johnson to the pawn shops. While they were on their way to a pawn shop on Charlotte Avenue, Johnson lost control of the car while trying to turn and struck a light pole on West End Avenue. The two then fled the scene on foot. Thus, sufficient evidence was presented for the jury to find the Defendant guilty of felony murder during the perpetration of a theft.

Although, as the State points out, "[w]hen the merger occurs, proof of either felony murder or premeditated murder is sufficient to sustain the conviction," State v. Kenneth Paul Dykas, No. M2000-01665-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 160, at *16 (Tenn. Crim. App., Nashville, March 5, 2002), permission to appeal denied (Tenn. July 15, 2002), in this case, the evidence independently supports the jury's verdict of guilty for the Defendant in the felony murder of Bill Wiggins. We may not disturb this finding by the jury on appeal.

### B. Motion to Suppress the Defendant's Statement to the Police

The Defendant contends that the trial court erred by denying his motion to suppress his audio-taped statement to the police. Specifically, he claims that he was in custody, without having been advised of his "Miranda" rights, during the interrogation on January 30, 1998, which elicited this statement.

When reviewing a trial court's ruling on a motion to suppress, "questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn.

1996).  Findings of fact made by a trial court in ruling on a motion to suppress are binding upon this Court unless the evidence preponderates against the findings.  See id.  However, the application of the law to the facts found by the trial court is a question of law which this Court reviews de novo.  See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).  The prevailing party "is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from the evidence." Odom, 928 S.W.2d at 23.  Finally, both the proof adduced at the suppression hearing and the proof adduced at trial may be considered in reviewing the trial court's decision on the motion to suppress.  State v. Henning, 975 S.W.2d 290, 299 (Tenn.1998).

In Miranda v. Arizona, the United States Supreme Court held that pursuant to the Fifth and Fourteenth Amendments' prohibition against compelled self-incrimination, police officers must advise a defendant of his or her right to remain silent and of his or her right to counsel before they may initiate custodial interrogation.  384 U.S. 436, 479 (1966).  If these warnings are not given, statements elicited from the individual may not be admitted for certain purposes in a criminal trial.  Stansbury v. California, 511 U.S. 318, 322 (1994).  A waiver of constitutional rights must be made "voluntarily, knowingly, and intelligently."  Miranda, 384 U.S. at 444.  The state has the burden of proving the waiver by a preponderance of the evidence.  State v. Bush, 942 S.W.2d 489, 500 (Tenn. 1997).  In determining whether a defendant has validly waived his Miranda rights, courts must look to the totality of the circumstances.  State v. Middlebrooks, 840 S.W.2d 317, 326 (Tenn.1992).

The appropriate inquiry in determining whether an individual is "in custody" and is thus entitled to Miranda warnings is whether, under the totality of the circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with a formal arrest. State v. Anderson, 937 S.W.2d 851, 855 (Tenn. 1996).  "The test is objective from the viewpoint of the suspect, and the unarticulated, subjective view of law enforcement officials that the individual being questioned is or is not a suspect does not bear upon the question."  Id.

> Some factors relevant to that objective assessment include the time and location of the interrogation; the duration and character of the questioning; the officer's tone of voice and general demeanor; the suspect's method of transportation to the place of questioning; the number of police officers present; any limitation on movement or other form of restraint imposed on the suspect during the interrogation; any interactions between the officer and the suspect, including the words spoken by the officer to the suspect, and the suspect's verbal or nonverbal responses; the extent to which the suspect is confronted with the law enforcement officer's suspicions of guilt or evidence of guilt; and finally, the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Id.  "It is a very fact specific inquiry."  Id.  "Application of the appropriate, relevant factors to the facts is a task for which the trial court is especially suited."  Id.

At the suppression hearing, Detective Dunaway testified that, in the course of investigating the murder of the victim, he found a job application in the victim's home with the Defendant's name

on it. Dunaway stated that he did a "trace" on the Defendant and, through the Defendant's parents in LaVergne, Tennessee, Dunaway discovered that the Defendant was living at the Anchor Home. Dunaway testified he first spoke with the Defendant at the Anchor Home, where he identified himself as a police officer and informed the Defendant of the death of the victim. Dunaway then asked the Defendant to accompany him to his office so that he could obtain the names, numbers, and addresses of everyone both the Defendant and the victim knew. Dunaway maintained that the Defendant was neither in custody at that time, nor was he handcuffed. Dunaway reported that the Defendant sat in the front seat of the detective's car as they rode to the Criminal Justice Center. Dunaway recalled that he and the Defendant had a general conversation while in the car and that they even went to a Taco Bell to get food on the way to the station. Dunaway stated that he and the Defendant did not discuss the case. Dunaway testified that, once at his office, he asked the Defendant about his relationship with the victim, about people that both the Defendant and the victim knew, and when he had last seen the victim. Dunaway recalled that at some point, the Defendant stated, "I was there when it happened." Dunaway testified that it was then that he stopped questioning the Defendant, Mirandized the Defendant, had him sign a waiver, and then continued to discuss the case with him.

On cross-examination, Detective Dunaway testified that he was accompanied by one other officer, Detective Vogel, when he went to the Anchor Home, but Vogel drove to the Anchor Home in a separate car. According to Dunaway, Vogel was also present while he was questioning the Defendant at the police station. Dunaway denied handcuffing the Defendant and denied putting him in the back seat of his car. He testified that the conversation with the Defendant at the police station lasted less than an hour before the Defendant first implicated himself, including the time it took to get a set of fingerprints from the Defendant for elimination purposes. This portion of the conversation was not recorded in any way. Dunaway testified that the Defendant knew during this time that he was free to leave.

Dunaway also testified on cross-examination that the taped statement began right after the Defendant was Mirandized. Dunaway denied ever having told the Defendant that Johnson was upstairs or that Johnson had given a statement to police implicating the Defendant. Dunaway also denied telling the Defendant that he thought he was lying, that he did not believe what the Defendant was saying, or that the Defendant had better start telling the truth. Dunaway testified that the Defendant provided no explanation as to why he simply decided to admit having knowledge about the homicide, and Dunaway reported that if the Defendant did state a reason, he did not recall it.

The Defendant testified that Dunaway came to the Anchor Home and told him that he needed to ask the Defendant some questions. The Defendant stated that Dunaway told him that he needed to go downtown with him to take his name out of suspect status. The Defendant testified that Dunaway told him he needed his fingerprints because his fingerprints were at the crime scene. The Defendant claimed that he was handcuffed on the street, after they left the Anchor Home and before he was placed in the back of the detective's car. The Defendant denied going to Taco Bell on the way to the police station. He testified that once in the interview room with the two detectives, he initially told the detectives that he had no knowledge of the homicide, although he admitted at the

hearing that this was untrue. The Defendant recalled that the detectives continued questioning him about what he had told them, and they then began to tell him they did not believe what he was saying. According to the Defendant, "[T]hey said I had a lot of inconsistencies." The Defendant denied that they ever told him he was free to leave. He further denied that the detectives told him at the Anchor Home that he did not have to go with them. The Defendant testified that he was told that Johnson had been arrested, that Johnson was incarcerated, and that Johnson had told them that the Defendant killed the victim. The Defendant stated that he then decided to tell the truth. He also testified that Dunaway told him that he had to make a statement in order to remove his name from the list of suspects and that if he cooperated, they would get him a low bond and have his charges reduced to theft. The Defendant testified that he told Dunaway everything he knew about the homicide; however, he claimed that he was not Mirandized, and he claimed that he did not see the "Miranda" form until after he told police everything. The Defendant testified that after he confessed, the detectives took a break, and Detective Vogel went to get the tape recorder. According to the Defendant, the detectives then read him his rights and asked him to repeat his statement on tape. After he was finished making his taped statement, the Defendant was arrested.

In a written opinion denying the motion to suppress the Defendant's statement, the trial court found the Defendant's credibility to be suspect because the Defendant had "lied about the facts at other times." The trial court determined that, considering all of the factors that the Tennessee Supreme Court enumerated in Anderson, 937 S.W.2d at 855, as guidelines for determining whether an individual has been subjected to a "custodial interrogation," it could not conclude that the guidelines of Anderson had not been complied with. See id. The trial court concluded there was no arrest when the Defendant left the Anchor Home with the officers, but that the Defendant "accompanied the officers freely and voluntarily." The trial court further concluded that the Defendant was properly advised of his "Miranda" rights and that he made his statements freely and voluntarily. Accordingly, the motion to suppress was denied.

On appeal, the Defendant argues that new information was revealed at trial which brings into question the credibility of Dunaway's testimony at the suppression hearing. The Defendant argues that Dunaway's statements at trial reveal inconsistencies regarding the timeline involved in obtaining the Defendant's statement. However, the Defendant raised the issue of the suppression of his statement in his motion for new trial, which was denied by the trial court. The trial court heard and had the opportunity to evaluate all the testimony from both the hearing on the motion to suppress the Defendant's statement and the trial. We conclude that the evidence does not preponderate against the findings of the trial court.

Our review of the record supports the trial court's finding that the Defendant voluntarily waived his Miranda rights. The Defendant testified that he was asked to accompany the officer downtown and that he decided to go. The Defendant also does not deny that he made the voluntary statement, "I was there when it happened." Dunaway testified that he read Miranda warnings to the Defendant before the Defendant gave his audio-taped statement, and the Defendant signed a "waiver of rights" form. A discussion of the Defendant's rights was also recorded on the tape. The trial court noted that the Defendant never requested an attorney. Thus, the trial court properly denied the

Defendant's motion to suppress the audio-taped statement he made to the police on January 30, 1998.

### III. CONCLUSION

Accordingly, we AFFIRM the judgments of the trial court.


_____
ROBERT W. WEDEMEYER, JUDGE